IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLE D. KIMBALL, | ) | CASE NO. 3:20-CV-01705 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Nichole Kimball ("Plaintiff" or "Ms. Kimball") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter

has been referred to the undersigned Magistrate Judge for a Report and Recommendation

pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

## I.  Procedural History

On May 18, 2018, Ms. Kimball filed an application for POD and DIB. (Tr. 210-16.) She

alleged a disability onset date of July 11, 2017. (Tr. 18.) She alleged disability due to disk

herniation with extrusion at C5-C6, spinal arthritis, cervical radiculopathy, scoliosis, spinal canal

1

stenosis, and hypersomnia.  (Tr. 255.)  Ms. Kimball's application was denied at the initial level

(Tr. 103-05) and upon reconsideration (Tr. 107-09), and she requested a hearing (Tr. 110-11).

On June 5, 2019, and October 15, 2019, hearings were held before an Administrative Law Judge

("ALJ").  (Tr. 48-79, 34-47.)

On October 25, 2019, the ALJ issued a decision finding that Ms. Kimball had not been

under a disability within the meaning of the Social Security Act from July 11, 2017, through the

date of the decision.  (Tr. 12-33.)  On June 1, 2020, the Appeals Council denied Ms. Kimball's

request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On August 3, 2020, Ms. Kimball filed a Complaint challenging the Commissioner's final

decision.  (ECF Doc. 1.)  The parties have completed briefing.  (ECF Docs. 14, 16, 17.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Kimball was born in 1985, and was 32 years old on the alleged disability onset date,

making her a "younger individual" under Social Security regulations at all relevant times.  (Tr.

52.)  She has a high school education and a cosmetology license.  (Tr. 54-55.)  Ms. Kimball

worked after the alleged disability onset date, but this work activity did not rise to the level of

substantial gainful activity.  (Tr. 18.)  Ms. Kimball's past work was classified as an assembly line

worker, receptionist, and medical billing clerk.  (Tr. 75-76.)

### B.    Medical Evidence

#### 1.    Treatment History

On December 23, 2016, Ms. Kimball sought care from Dr. James A. Gottfried.  (Tr. 375.)

She reported she "cannot focus and gets in a fog."  (*Id*.)  Despite getting eight hours of sleep

nightly, she reported she did not feel rested.  (*Id*.)  Dr. Gottfried noted she had a one and a half

2

year old child, and that a recommended sleep study was "pending due to insurance purposes." (*Id*.)  She denied depression and reported a diet that included high protein drinks for breakfast and lunch, and a "meat, potatoes, vegetable" dinner, with fruits, vegetables, or almond bars for a snack.  (*Id*.)  Dr. Gottfried assessed chronic fatigue, dietary deficiency, and mild depression.  (Tr. 376.)  He ordered some blood tests and started her on a two-week trial of 20 mg of Fetzima for depression.  (*Id*.)  Fetzima was discontinued on February 25, 2017.  (Tr. 349.)

On January 4, 2017, Ms. Kimball sought treatment from Dr. Christopher Avendano at Fireland Physician Group for excessive daytime sleepiness and fatigue with decreased mental acuity.  (Tr. 337.)  Dr. Avendano noted a home sleep test completed December 28, 2016 "revealed no evidence of a sleep related breathing disorder."  (*Id*.)  He recommended an attended sleep test and prescribed Provigil to help with alertness.  (Tr. 337-38.)

Ms. Kimball returned to Dr. Avendano on February 15, 2017, for a follow up appointment.  (Tr. 335.)  She reported difficulty getting her prescribed stimulant (Provigil) and "ultimately has been on Concerta," which made her irritable and did not improve her symptoms of tiredness and fatigue.  (*Id*.)  Dr. Avendano explained he was hesitant to prescribe other medications until an attended sleep study fully excluded a sleep-related breathing disorder or confirmed periodic limb movements associated with sleep.  (Tr. 336.)

Ms. Kimball returned to Dr. Avendano again on March 22, 2017, for a follow up to a February 15, 2017 baseline polysomnogram which confirmed no evidence of obstructive sleep apnea or significant periodic limb movements associated with sleep.  (Tr. 332.)  She continued to report symptoms of excessive daytime tiredness and sleepiness, including while driving.  (*Id*.)  Dr. Avendano discontinued Concerta and initiated treatment with Adderall, noting that he still recommended a multiple sleep latency test to exclude narcolepsy.  (Tr. 333.)

Ms. Kimball returned to Dr. Gottfried[1] on July 11, 2017, for treatment of back pain.  (Tr. 386.)  She reported she began experiencing pain in her lumbar region two months prior, and described it as "moderate and non-radiating," but severe enough to wake her from sleep.  (*Id*.)  It began suddenly when she was at the Kalahari water park, went down a slide, and hit the concrete.  (*Id*.)  The pain was aggravated by sitting, and alleviated by heat or cold.  (*Id*.)  She reported her back was stiff in the morning.  (*Id*.)  She denied fatigue.  (*Id*.)  On examination, her neck had a normal range of motion, her spine was not tender, straight leg raising was negative, there was no joint or limb tenderness to palpation in the lower extremities, and range of motion of her extremities was normal.  (Tr. 387.)  Neurological testing revealed normal muscle strength, no atrophy, normal reflexes, and intact sensation.  (Tr. 388.)  Dr. Gottfried noted some tenderness paraspinally in her lower lumbar region and restriction in extension of her lumbar spine.  (*Id*.)  He assessed backache and back injury, and ordered lumbar x-rays and physical therapy.  (*Id*.)  He also offered muscle relaxants, but Ms. Kimball declined explaining she did not like to take medications.  (*Id*.)  Nevertheless, she reported managing her pain with ibuprofen "around the clock," and Dr. Gottfried discussed medication safety and advised her to alternate ibuprofen and Tylenol.  (*Id*.)

On October 13, 2017, Ms. Kimball was seen by Dr. Gottfried's colleague, Dr. Amy Browne, for "tearfulness."  (Tr. 398.)  She reported she had been moderately depressed and irritable for weeks, and increasing issues with sleeping.  (*Id*.)  She denied all other symptoms.  (*Id*.)  On examination, all of Dr. Browne's findings were in the normal range, including intact judgment and insight, and appropriate mood and affect.  (Tr. 399-400.)  She assessed generalized anxiety disorder, and prescribed 5 mg of Lexapro.  (Tr. 400.)

---

[1] Dr. Gottfried is identified as the provider for this visit, but the treatment notes are electronically signed by Nurse Practitioner Maureen Jorden.  (Tr. 386, 388.)

Ms. Kimball returned to Dr. Browne for follow up care on November 13, 2017.  (Tr. 401.)  She reported that she was taking her medication, but having no relief.  (*Id*.)  Again, all physical examination findings were normal.  (Tr. 402-03.)  Dr. Browne increased Ms. Kimball's dosage of Lexapro to 10 mg.  (Tr. 403.)

Ms. Kimball returned to her sleep specialist, Dr. Avenando, on December 11, 2017, and reported that taking Adderall three times a day was decreasing her tiredness, and that she had experienced some improvement in her energy level with exercise.  (Tr. 330-31.)  Dr. Avenando noted she had lost weight, but reported that Ms. Kimball "feels this is more related to her workout activity and change in diet."  (Tr. 331.)  He discussed a trial of a different medication, Xyrem, but Ms. Kimball chose to continue with Adderall at that time.  (*Id*.)

On December 18, 2017, Ms. Kimball again returned to Dr. Browne for follow up care. (Tr. 404.)  She described her anxious feelings as "improving with treatment."  (*Id*.)  Again, all of Dr. Browne's physical examination findings were within normal limits.  (Tr. 405.)  Dr. Browne noted Ms. Kimball was "doing well with the lexapro," and recommended she return in three months.  (*Id*.)

On February 20, 2018, Ms. Kimball was treated by Dr. Matthew Petznick for pain in her right shoulder.  (Tr. 316.)  She reported the injury sustained at Kalahari six months prior, and explained she had begun physical therapy, but stopped halfway through due to pain, popping, and rubbing sensations in her right shoulder.  (*Id*.)  She was taking ibuprofen and Aleve to treat the pain.  (*Id*.)  Dr. Petznick's assessments were winging of scapula and cervical pain.  (*Id*.)  He prescribed prednisone and ordered x-rays and an MRI of the affected area.  (*Id*.)

X-rays performed on March 20, 2018 showed mild degenerative changes in Ms. Kimball's cervical spine, including slight interspace narrowing at C5-C6, and minimal anterior

marginal spurs involving vertebral bodies at C4-C5 and C5-C6.  (Tr. 313.)  An MRI of Ms.

Kimball's cervical spine performed on April 11, 2018, revealed mild interspace narrowing at

C5/6 with small posterior hypertrophic spurs and posterior disc herniation which impinges on

and mildly flattens the cervical spinal cord anteriorly to the right of midline.  (Tr. 312, 409.)  The

defect also impinged on the C7 nerve root sleeve on the right.  (*Id.*)

On April 17, 2018, a sleep study performed at the Firelands Regional Medical Center

concluded Ms. Kimball had "for the most part normal sleep architecture," with no evidence of

sleep related breathing disorder or clinically significant periodic limb movements.  (Tr. 341-42.)

Dr. Avendano concluded she demonstrated excessive somnolence with no clear cause and

diagnosed idiopathic hypersomnolence.  (Tr. 339.)  He recommended use of stimulants and good

sleep hygiene.  (*Id.*)

On April 23, 2018, Dr. Petznick reviewed the MRI and diagnosed herniated nucleus

pulposus at C5/6 on the right entrapping the C7 nerve.  (Tr. 314.)  He noted Ms. Kimball had

been experiencing numbness in her right shoulder and arm for the last month, and was treating

the pain with Motrin without relief.  (*Id.*)  He prescribed gabapentin to be taken before bedtime,

and referred her to a neurosurgeon.  (*Id.*)

On the same day, Ms. Kimball saw Dr. Avendano for a follow up on the sleep study

performed earlier in April.  (Tr. 328.)  Dr. Avendano noted "she does not meet the criteria for

narcolepsy though has a tendency toward narcolepsy and is clearly excessively somnolent."  (*Id.*)

She declined use of Xyrem due to concerns about having difficulty awakening since she was

caring for a 2-year-old and a 5-year-old child.  (Tr. 329.)  She was encouraged to take holidays

from Adderall as often as possible to prevent tolerance to therapy.  (*Id.*)

Dr. Dale Braun examined Ms. Kimball on May 24, 2018 for her neck pain, and noted that she was complaining of numbness in her right arm and reported dropping things more often.  (Tr. 321.)  She reported the prednisone and gabapentin prescribed by Dr. Petznick provided "minimal relief."  (*Id*.)  On examination, Dr. Braun's findings were all in the normal range, including a "supple" neck, normal bilateral handgrip and normal sensory findings in both upper and lower extremities.  (*Id*.)  Dr. Braun assessed cervical pain in the neck, right hand paresthesia, and other cervical disc disorders at C5-C6 level.  (Tr. 323.)  He noted "[h]er hand symptoms I believe are early carpal tunnel symptoms," and opined: "I doubt she has any acute radiculopathy."  (*Id*.)  He recommended use of a brace and referred her to pain management.  (*Id*.)

On June 12, 2018, pain management specialist Dr. Joshua Goldner assessed Ms. Kimball with cervical radiculitis secondary to disc displacement, with pain significantly impacting the quality of her life and activities of daily living.  (Tr. 417.)  On examination, Ms. Kimball rose easily from a seated position and walked with a normal gait.  (*Id*.)  She had a full range of motion in her cervical spine, full range of motion in both shoulders without pain, and full strength in her bilateral upper and lower extremities.  (*Id*.)  He noted diffuse tenderness in the C6 region on palpation, and a positive Spurling's sign on the right.  (*Id*.)  Dr. Goldner recommended a cervical epidural steroid injection, which was performed on June 25, 2018.  (Tr. 418-20.)

Ms. Kimball returned to Dr. Goldner's associate Amanda Springer, PA-C, on July 9, 2018, and reported that she had pain relief for two days after the epidural injection, but then the pain returned, causing aching and stabbing sensations at the back of her neck and down the right side of her body.  (Tr. 421.)  She had a second injection on July 23, 2018 (Tr. 424) with reported improvement for only three days (Tr. 426).

2.     **Opinion Evidence**

i.     **Opinion of Plaintiff's Treating Medical Provider**

Dr. Avendano completed a Sleep Disorders Medical Source Statement on March 27, 2019.  (Tr. 430-32.)  He wrote that he had seen Ms. Kimball every three months since November 2016, for prescription of stimulants.  (Tr. 430.)  He diagnosed idiopathic hypersomnolence accompanied by excessive daytime sleepiness, but noted she did not have recurrent daytime sleep attacks.  (*Id*.)  It was his opinion that she could sit or stand for more than two hours at one time, for a total of at least six hours in an eight-hour working day, but would need to take breaks for twenty to thirty minutes one to two times a day due to chronic fatigue.  (Tr. 431.)  He opined that Ms. Kimball had no restrictions in performing routine repetitive tasks, and was capable of low stress work, but would be off task 15% of a workday.  (Tr. 432.)

ii.     **Opinions of State Agency Reviewers**

On July 8, 2018, state agency reviewing physician Dr. Stephen McKee reviewed the record and opined that Ms. Kimball was limited to work at a medium level of exertion with occasional overhead reaching bilaterally.  (Tr. 84-85.)

On October 5, 2018, state agency reviewing physician Yeshwanth Bkai, M.D., reviewed the record and concluded that Ms. Kimball was limited to work at the light exertional level with occasional overhead reaching bilaterally.  (Tr. 97-99.)

C.     **Hearing Testimony**

1.     **Plaintiff's Testimony**

Two hearings were held in this case.  At the first hearing, on June 5, 2019, Ms. Kimball testified that she was married and lived with her husband and two children, ages seven and four.  (Tr. 53.)  She had a driver's license with no restrictions except for corrective lenses, and drove

about twice a week to take her son to preschool, which was five miles from her home.  (Tr. 53-54.)  The farthest she had driven at any one time was to appointments at the sleep lab, twenty minutes from her home.  (Tr. 54.)  About 90% of the time when she made that twenty-minute drive, she reported she would have to pull over and get out of the car to walk around for ten or fifteen minutes to stay alert.  (Tr. 67-68.)

On a typical day, she woke around 7:00 a.m., took her medication, and made her kids breakfast.  (Tr. 63.)  She also made their lunch, but her husband made dinner.  (Tr. 64.)  Preschool was on summer break, so she and her kids lounged around until her husband got home from work around 5:00 p.m.  (Tr. 64.)  They played with their toys inside.  (Tr. 65.)  She napped when the kids napped, for about two hours a day.  (Tr. 66.)  Otherwise, the kids were pretty active, which helped her stay awake.  (Tr. 66.)  She tried to go to bed around 11:00 p.m., and woke at 6:30 or 7:00 a.m.  (Tr. 67.)  She also did grocery shopping and household chores, including dishes and laundry, although her husband helped.  (Tr. 69.)

The last time she worked full time was in July of 2017.  (Tr. 55.)  She worked as a medical receptionist for two different practices.  (Tr. 56, 57-58.)  In that job, she could sit or stand at will.  (Tr. 56, 58.)  In between those jobs, she worked as on a factory line as a bagger.  (Tr. 57.)  In that job, she stood nearly all the time.  (*Id.*)  She also previously worked as a medical biller.  (Tr. 58.)  She stopped working in as a medical receptionist in July 2017 because she was falling asleep at work.  (Tr. 59.)  After that, she briefly tried working at a cleaning service because she thought moving around might keep her awake, but found she was exhausted when she got home.  (*Id.*)

Her back issues caused pain, but she had become kind of used to it.  (Tr. 61.)  She managed the pain with ibuprofen.  (*Id.*)  She did not believe her back issues prevented her from

working.  (*Id.*)  She could walk about a mile and could sit for maybe half an hour before she needed to get up to give herself some stimulation.  (Tr. 65.)

She reported her sleeping disorder was what stopped her from working.  (Tr. 61.)  When she woke up in the morning, she was not refreshed, so she took Adderall first thing in the morning and twice more during the day.  (Tr. 61-62.)  She had been taking it for over a year, increasing the dosage from 5 mg once a day to 20 mg three times a day, and did not feel it helped.  (Tr. 62, 73.)  When she told her doctor that it did not help, the doctor told her she had built up a tolerance, and needed to take "medication holidays."  (*Id.*)  She followed his instructions, but it did not help.  (*Id.*)  When she told her doctor, he explained that she was at the maximum dosage and had already tried every other medication for her diagnosis.  (Tr. 63.)

She reported that on days when she was active with her kids, she was more tired the next day.  (Tr. 72.)  She would get drowsy while playing with them, but did not fall asleep.  (Tr. 73.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the June 5, 2019 hearing, and classified Ms. Kimball's past work as that of assembly line worker, receptionist, and billing clerk.  (Tr. 75-76.)

For her first hypothetical, the ALJ asked the VE to assume an individual of Ms. Kimball's age and education and with her past work, with the following functional limitations:

> For my first hypothetical, please consider an individual with the Claimant's age, education and work experience. The individual can perform at the light exertional level with the following limitations. Never climb ladders, ropes or scaffolds. Occasionally reach overhead with the bilateral upper extremities.  Frequently handle, finger and feel with the right upper extremity. The individual can hold her neck in a static position for periods of up to five minutes before having to move her head for 15 to 30 seconds. The individual can never be exposed to hazards such as moving machinery and unprotected heights and may not engage in commercial driving.

(Tr. 76.)

The VE testified that the hypothetical individual would be able to perform Ms. Kimball's past work as a receptionist or billing clerk.  (Tr. 76-77.)  The VE further testified that the hypothetical individual could perform other representative positions in the national economy, including general office helper, sorter, or cashier.  (Tr. 77.)

The VE explained that if someone is off-task more than 15% of the time due to excessive sleepiness, that would be considered work preclusive.  (Tr. 77-78.)  Further, many employers do not allow any absences in the first ninety days of employment, and no more than one absence per month after that.  (Tr. 78.)

### 3.       Supplemental Hearing

A supplemental hearing was held on October 15, 2019.  (Tr. 34.)   Ms. Kimball's counsel had filed a post-hearing brief pointing out that her past work as a receptionist and billing clerk required frequent reaching as described in the DOT, and the ALJ's hypothetical contained a limitation to "occasional reaching overhead with the bilateral upper extremities."  (Tr. 36.)

A new VE concurred with the prior VE that the hypothetical individual could perform Ms. Kimball's prior work as a receptionist, as well as other work such as general office helper, sorter, and cashier.  (Tr. 39-41.)  However, he explained that the job of billing clerk requires constant fingering, which would be precluded by the hypothetical due to the limitation to frequent fingering with the right upper extremity.  (Tr. 40.)

The VE was then asked if his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), particularly in light of the fact that the DOT stated the relevant jobs required frequent reaching but the hypothetical individual was limited to occasional overhead reaching.  (Tr. 41.)  The VE explained that the DOT "does not address the ability for overhead reach," saying "when we're talking about reaching, we're talking about reaching in all

11

other directions, not overhead." (*Id.*)  He further clarified, "[t]hese occupations do not require overhead reaching." (*Id.*)

If the hypothetical individual was limited to handling, fingering or feeling up to 40% of the workday, the VE testified the individual could not perform the job of receptionist or any of the other identified jobs. (*Id.*)  The VE also testified that a limitation requiring the hypothetical individual to hold their neck static for five minutes, then move it for fifteen to thirty seconds, would not have an effect on the identified occupations. (Tr. 43.)  However, when Ms. Kimball's attorney changed the hypothetical to require the hypothetical individual to stop performing work while she moved her neck for fifteen to thirty seconds every five minutes, the VE testified that this would cause the hypothetical individual to be excessively off task, precluding competitive employment. (Tr. 44.)  The VE testified that, in his experience, it was possible to remain on task while moving one's neck as the hypothetical described. (Tr. 45.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901, *et seq.*, corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In her October 25, 2019 decision, the ALJ made the following findings:[3]

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2023.

2.   The claimant has not engaged in substantial gainful activity since July 11, 2017, the alleged onset date.

3.   The claimant has the following severe impairments: degenerative disc disease of the cervical spine with C5-6 herniated nucleus pulpous and right hand paresthesia; and early degenerative changes of the lumbar spine.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: never climb ladders, ropes, or scaffolds; occasionally reach overhead with the bilateral upper extremities; and frequently handle, finger, and feel with the right upper extremity. She can hold her neck in a static position for periods of up to five minutes before having to move her head for 15 to 30 seconds. She can never be exposed to hazards such as moving machinery and unprotected heights; and may not engage in commercial driving.

6.   The claimant is capable of performing past relevant work as a Receptionist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(Tr. 18-25.)  Based on the foregoing, the ALJ determined that Ms. Kimball had not been under a disability, as defined in the Social Security Act, from July 11, 2017, through the date of the decision on October 25, 2019.  (Tr. 28.)

## V. Plaintiff's Arguments

In her Brief on the Merits, Ms. Kimball raised the following assignments of error:

1.   The ALJ erroneously failed to find that Kimball's hypersomnolence was a severe impairment and the ALJ's RFC failed to properly consider and incorporate the opinion of the treating physician, Dr. Avendano.

---

[3] The ALJ's findings are summarized.

2.   The ALJ erroneously failed to incorporate all the restrictions regarding Kimball's cervical spine impairment in the RFC, in finding that Kimball did not have disabling pain, and in finding that her testimony was not credible.

3.   The ALJ committed harmful error when she found that Kimball could still perform her past work as a receptionist as the testimony of the vocational witness violated HALLEX I-2-6-74 and Social Security Ruling 00-4p. The ALJ further failed to satisfy her burden at Step Five of the Sequential Evaluation.

(ECF Doc. 14, p. 1.)

## VI. Law & Analysis

### A.   Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Where, as here, the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x

15

543, 550 (6th Cir. 2010); *citing Osburn v. Apfel,* 182 F.3d 918 (table), 1999 WL 503528, *4 (6th Cir. 1999). The Sixth Circuit has made clear that "we may only review evidence that was available to the ALJ to determine whether substantial evidence supported her decision." *Id.*

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence (or even a preponderance of the evidence) supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), *quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.      First Assignment of Error: Hypersomnolence Arguments**

Ms. Kimball asserts a number of discrete arguments regarding her sleep impairment in her first assignment of error.  She argues first that the ALJ erred at Step Two when she concluded that Ms. Kimball's hypersomnolence was not severe because it was managed medically and caused no more than minimal limitations on her ability to do basic work activities. (ECF Doc. 14, pp. 9-10.)  She next argues that the ALJ's determination of residual functional capacity ("RFC") was not supported by substantial evidence because it failed to account for Ms. Kimball's excessive sleepiness and her need to nap.  (ECF Doc. 17, p. 1.)  Finally, she contends that the ALJ failed to provide a coherent explanation for her finding that the opinion of Ms. Kimball's sleep specialist was only somewhat persuasive, and also failed to identify any contemporaneous evidence to support her conclusion regarding the severity of Ms. Kimball's hypersomnolence.  (*Id*. at 2.)

**1.      Whether ALJ Erred in Finding Sleep Impairment Was Nonsevere**

With respect to the first two arguments, the Commissioner responds that ample evidence supports the ALJ's finding that hypersomnolence was a non-severe impairment, including medical treatment records from her primary care physician and sleep specialist, and the State agency reviewing physicians' opinions.  (ECF Doc. 16, pp. 14-15.)  She further argues that any error at Step Two is not grounds for remand since the ALJ found other severe impairments, continued her analysis, and made accommodation for Ms. Kimball's hypersomnolence in the RFC.  (*Id.* at 14.)

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221 (table), 1990 WL 41835, *2 (6th Cir. 1990) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe"

impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007) (citing 20 C.F.R. § 416.920); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).  The ability to do basic work activities, means having "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  *Id*.

Step two is a "*de minimis* hurdle ... intended to screen out totally groundless claims." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (internal quotations and citations omitted). Thus, "if an impairment has more than a minimal effect on the claimant's ability to do basic work activity, the ALJ must treat it as severe."  *Id*.; *see Titles II & XVI: Med. Impairments That Are Not Severe,* SSR 85-28 (S.S.A. 1985) ("not severe" finding is appropriate when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work…").  Although the standard is *de minimis*, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

18

Where an ALJ has identified both severe and nonsevere impairments, the Sixth Circuit

has sometimes held that a decision finding some impairments nonsevere was not reversible error

because the Commissioner could still consider the nonsevere impairments in assessing the RFC.

*See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also*

*Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (finding it "legally irrelevant" that

some impairments were not deemed severe where the designation of other impairments as severe

"cleared step two of the analysis" and thus caused the ALJ to consider both "severe and

nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of*

*Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ

characterized any other alleged impairment as severe or not severe is of little consequence" when

ALJ found a severe impairment at step two).

However, this harmless error standard is not applicable where an ALJ has failed to

consider the nonsevere impairments in assessing the RFC.  *See Simpson v. Comm'r of Soc. Sec.,*

344 F. App'x 181, 190-91 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error

when an ALJ found that plaintiff's nonsevere mental impairments "would not be considered in

assessing her RFC"); *Dudley v. Comm'r of Soc. Sec.,* No. 2:16-CV-0682, 2017 WL 2374432, *4

(S.D. Ohio June 1, 2017) (finding harmless error did not apply to finding mental impairments

nonsevere when ALJ "did not take any mental impairments or limitations into account" in the

RFC), *report and recommendation adopted*, No. 2:16-CV-682, 2017 WL 2645962 (S.D. Ohio

June 20, 2017); *Rose v. Comm'r of Soc. Sec.*, No. 2:14-CV-1901, 2015 WL 6735313, *5 (S.D.

Ohio Nov. 4, 2015) (finding harmless error analysis "is appropriate only when the ALJ properly

considered any functional limitations arising from non-severe impairments when crafting his

residual functional capacity finding"), *report and recommendation adopted*, No. 2:14-CV-1901,

2015 WL 7779300 (S.D. Ohio Dec. 2, 2015); *see also Pompa*, 73 F. App'x at 803 (applying harmless error standard where "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment finding").

Here, it is undisputed that the ALJ considered the effects of Ms. Kimball's sleep disorder on her RFC, explaining as follows:

> The above stated condition has been managed medically and should be amenable to proper control by adherence to recommended medical management and medication compliance. No aggressive treatment was recommended or anticipated. The record supports that this impairment causes no more than minimal limitations on the claimant's ability to do basic work activities. Accordingly, the undersigned finds that it is not severe. Nevertheless, the undersigned has accounted for all impairments in the residual functional capacity as necessary taking into account the totality of the record. Specifically, with regard to hypersomnia, the condition is accommodated in the residual functional capacity by limiting the claimant to no exposure to hazards, no commercial driving, no climbing of ladders, ropes, and scaffolds, and to light exertional level work.

(Tr. 19 (emphasis added).) In her subsequent discussion of the severe impairments, opinion evidence, and RFC, the ALJ went on to state:

> In addition, considering her cervical impairment and her non-severe impairments (including hypersomnia), the undersigned has also incorporated environmental limitations restricting the claimant for all exposure to hazards such as moving machinery and unprotected heights and from engaging in commercial driving.

(Tr. 24 (emphasis added).)

Even though the ALJ explicitly applied limitations arising from nonsevere hypersomnia in the RFC, Ms. Kimball nevertheless argues that the decision was erroneous because the "RFC … did not account for Plaintiff's excessive daytime sleepiness and her need to nap." (ECF Doc. 17, p. 1.) Effectively, she contends that the statutory requirements have not been met because she believes the ALJ should have applied more restrictive limitations in the RFC, or in other words because the limitations applied by the ALJ were not supported by substantial evidence. (ECF Doc. 17, p. 1.)

It is well-established that a reviewing court cannot overturn an ALJ's decision, even if supported by a preponderance of the evidence, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Here, the ALJ supported her findings with relevant evidence a reasonable mind might accept as adequate to support her conclusions.  In finding hypersomnoia nonsevere, the ALJ cited June 2018 treatment notes from Ms. Kimball's primary care physician which reflect "mild to moderate feelings of being tired, which she alleged waxed and waned over time."  (Tr. 19 (citing Tr. 410).)  In July and October 2018, it was noted Ms. Kimball reported increasing tiredness, "particularly when she was off Adderall."  (Tr. 19 (citing Tr. 440-42).)  The ALJ also noted in assessing Ms. Kimball's nonsevere mental health impairments that:

> the record supports the claimant cares for her children fulltime, when her spouse is at work, manages her medications, has sufficient concentration to watch TV, prepare simple meals, and complete some household chores. (by testimony)

(Tr. 20.)  The ALJ additionally noted that Ms. Kimball was able to manage her appointments and drive, though her driving was "limited due to fatigue."  (*Id.*)

Beyond the ALJ's specific findings, a review of the record as a whole also supports a finding that substantial evidence supported the ALJ's conclusion that hypersomnia was nonsevere and would be adequately accommodated by the limitations articulated in the RFC. (*See, e.g.,* Tr. 328-29 (noting she does not meet criteria for narcolepsy and declined to use Xyrem due to concerns about difficulty awakening while caring for two year old and five year old); Tr. 330-31 (noting Adderall was decreasing her tiredness and her energy level improved with exercise, and she declined trial of Xyrem); Tr. 332 (noting baseline polysomnogram confirmed no evidence of obstructive sleep apnea or significant periodic limb movements); Tr. 337 (noting home sleep test "revealed no evidence of sleep related breathing disorder"); Tr. 339

(noting idiopathic hypersomnia could be managed with stimulants and good sleep hygiene); Tr. 341-42 (sleep study noting "for the most part normal sleep architecture").)

For all of the reasons stated above, the record does not support a finding that the ALJ erred in finding hypersomnia to be a nonsevere impairment.

### 2.      Whether ALJ Erred in Finding Medical Opinion Only Somewhat Persuasive

The third prong of Ms. Kimball's hypersomnia argument is that the ALJ erred by failing to assess the opinion of sleep specialist Dr. Avendano in accordance with the governing regulations, failing to provide a coherent explanation for her finding that the opinion was only partially persuasive, and failing to identify any contemporaneous evidence to support her conclusion.  (ECF Doc. 14, p. 12; ECF Doc. 17, p. 2.)

Because Ms. Kimball's claim was filed after March 27, 2017, it must be evaluated under revised regulations which require the ALJ to evaluate opinion evidence primarily based on the opinion's consistency with other evidence in the record and supportability.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).  The categories of evidence to be considered under these new regulations include: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings.  20 C.F.R. § 416.913(a)(1)-(5).

The regulations specify that SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 416.920c(a). Distinct from a prior framework that gave more weight to opinions from treating sources, the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness'

22

of medical opinions by using the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)).

The five factors are supportability, consistency, relationship with claimant, specialization, and other factors, but supportability and consistency are acknowledged to be the most important factors for consideration.  20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2).  The regulations define "supportability" as: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  The regulations define "consistency" as: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

While ALJs are expected to explain how consistency and supportability were considered, they "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."  20 C.F.R. § 416.920c(b)(2).  Ultimately it is the ALJ, not any medical provider, who is responsible for determining the claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).

In his March 2019 medical source statement, Dr. Avendano used a checkbox form to identify Ms. Kimball as suffering a single symptom on a checkbox list of sleep disorder signs and symptoms: excessive daytime sleepiness.  (Tr. 430.)  She did not have recurrent daytime sleep attacks.  (*Id.*)  While she could sit, stand, lift, and carry consistent with light exertional work, he opined that she would take one to two unscheduled breaks of twenty to thirty minutes during the workday due to "chronic fatigue" and be off task 15% of the workday.  (Tr. 431-32.)  He recommended she avoid even moderate exposure to driving, heights, moving machinery, working alone without supervision, and power tools, but opined she was capable of "low stress work" and "routine, repetitive tasks."  (Tr. 423.)

The ALJ addressed Dr. Avendano's opinion as follows:

> In addition, the undersigned has considered the opinion submitted by Christopher Avendano, M.D., on March 27, 2019. (7F). …  Dr. Avendano's exertional limitations are consistent with light exertional level work and his environmental limitations regarding avoidance of power tools, moving machinery, heights, and driving are also generally consistent with the State agency assessment at the reconsideration level of review, discussed above. However, Dr. Avendano's assessment that the claimant requires "low stress" work, requires extra breaks, or will be off task for 15% of the day or more, are not specifically explained or supported with specific evidence or findings other than general notes of fatigue. Moreover, "low stress" work is not defined by Dr. Avendano and the record supports the claimant's only treatment for fatigue has been outpatient and limited in nature (medication). For these reasons, overall, Dr. Avendano's assessment is found to be overall only somewhat persuasive.

(Tr. 23-24.)  This recitation reflects that the ALJ addressed the "consistency" factor by noting that a number of the proposed limitations were consistent with the State agency assessment at the reconsideration level, and that the ALJ addressed the "supportability" factor by noting that the proposed findings regarding low stress work, extra breaks, and off task behavior were not "supported with specific evidence or findings other than general notes of fatigue."  (*Id.*)  Thus,

the ALJ complied with regulatory requirements governing the factors to be discussed in support of her finding that the opinion was "only somewhat persuasive."

Ms. Kimball's additional arguments – that the ALJ failed to provide a coherent explanation for her findings and failed to identify contemporaneous evidence to support her conclusion – effectively amount to an argument that the ALJ's persuasiveness finding was not supported by substantial evidence.  (*See* ECF Doc. 17, p. 2 (citing *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, *10 (N.D. Ohio Dec. 11, 2020) ("The Social Security Agency's express intention in adopting the Revised Regulations was to re-focus judicial review on the critical issue of whether an ALJ's decision was supported with substantial evidence."), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20CV1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021)).)

As discussed above, the Court must consider the ALJ's decision as a whole, as well as other evidence of record in determining whether a finding is supported by substantial evidence. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the [Commissioner's] findings must be based on the record as a whole."); *Jones v. Comm'r of Soc. Sec.*, No. 1:10-CV-2590, 2012 WL727737, *23 (N.D. Ohio Mar. 6, 2012) (finding ALJ's decision is to be read as a whole, and need not repeat findings that have already been discussed).

Here, a review of the decision and record as a whole requires a finding that the ALJ's finding that the opinion was "only somewhat persuasive" is supported by substantial evidence. Consistent with the ALJ's findings, a review of the record does not reveal medical testing or objective findings that support a need for "low stress work," extra breaks, or a need to be off task 15% of the workday, "beyond general notes of fatigue."  (Tr. 24.)  Multiple sleep tests revealed no findings suggestive of a sleep related breathing disorder or significant periodic limb

movements, with the final impression being "[e]xcessive somnolence without evidence of significant obstructive sleep apnea, periodic limb movement disorder, and with a multiple sleep latency test that does not meet criteria for narcolepsy," with Ms. Kimball suffering "more of a case of idiopathic hypersomnolence." (Tr. 332, 337, 339, 341-342.)  It is observed that the lone clinical note of "excessive somnolence" is materially consistent with the ALJ's observation that the opinion regarding off-task behavior and breaks was supported only by "general notes of fatigue." (Tr. 24.)  Thus, it is evident that the ALJ provided a coherent explanation for her reasoning in finding the opinion only somewhat persuasive.

It is additionally noted that the complete record regarding Ms. Kimball's treatment modalities and activities of daily living further support a finding that the ALJ's persuasiveness finding was supported by substantial evidence.  Ms. Kimball was treated first with Concerta (Tr. 335), then with Adderall (Tr. 333) for her sleep disorder.  Dr. Avendano considered use of stimulants and good sleep hygiene the best course of treatment (Tr. 339), but offered an alternative medication, Xyrem (Tr. 329).  Ms. Kimball declined treatment with Xyrem twice, first because she felt her condition was stable with support and she was getting benefit from Adderall (Tr. 331), and next because of "concern with taking a second dose and also having difficulty awakening as she is caring for a 2-year-old and 5-year-old child" (Tr. 329).  In June 2018, she reported feeling tired to her primary care physician, with "mild to moderate" symptoms "waxing and waning over time."  (Tr. 410.)  She testified at her hearing that she felt she could safely care for her two young children (then ages seven and four) alone all day while her husband was at work.  (Tr. 66.)  And while she testified that she generally napped when her children were napping (*id*.), the record does not objectively substantiate Ms. Kimball's assertion that she had a medical "need to nap" (ECF Doc. 17, p. 1).

The absence of significant objective findings, conservative treatment, unwillingness to try other treatment modalities, contemporaneous reports of "mild to moderate" symptoms that waxed and waned, and reported ability to act as the primary caregiver for two very young children throughout the relevant period, in addition to performing some household chores and driving, all provide substantial evidence to support the ALJ's finding that Dr. Avendano's opinion findings limiting Ms. Kimball to low stress work, with extra breaks and off task behavior were not persuasive.

For all the foregoing reasons, the undersigned finds that the ALJ's finding that the opinion of Dr. Avendano was "only somewhat persuasive" was consistent with regulatory requirements and supported by substantial evidence.  Accordingly, the undersigned finds that Ms. Kimball's first assignment of error is without merit.

## C.  Second Assignment of Error: Cervical Spine Impairment Arguments

Ms. Kimball also argues the ALJ erred in her analysis of the pain and functional restrictions caused by her cervical spine impairment.  (ECF Doc. 14, p. 1.)  First, she asserts the ALJ failed to note nerve impingement that would satisfy Listing 1.04.  (*Id*. p. 15.)  Next, she asserts that the ALJ's RFC limitation to "frequent handling, fingering and feeling with the right upper extremity," is not supported by substantial evidence because the record supports no more than occasional use of her right upper extremity for handling, fingering, and feeling.  (*Id*.)  Finally, she asserts the ALJ did not assess the credibility of her testimony regarding her right hand impairment and disabling pain in accordance with the regulations.  (*Id*. pp. 15-16.)  Each of these arguments is addressed in turn below.

27

## 1.    Whether ALJ Erred in Finding Ms. Kimball Did Not Meet Listing 1.04

At Step Three of the disability evaluation process, a claimant is disabled if his "impairment(s) meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement." *See* 20 C.F.R. § 404.1520(a)(4)(iii).  The Listing of Impairments sets forth impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a).  Therefore, a claimant who meets both the requirements of a Listed Impairment and the durational requirement is deemed conclusively disabled.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3).  It is a claimant's burden to "show that his condition meets or equals one of the listed impairments." *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987).  A claimant must satisfy all of the criteria to meet the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (*citing* 20 C.F.R. § 404.1525(c)(3) ). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is also disabled if his impairment is the "medical equivalent" of a listing, 20 C.F.R. § 404.1525(c)(5), which means the impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

During the relevant time period, Listing 1.04 addressed spine disorders, and specified in pertinent part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc diseases, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing § 1.04(A). The ALJ held that Ms. Kimball had the severe impairments degenerative disc disease of the cervical spine with C5-6 herniated nucleus pulpous and right hand parasthesia, and early degenerative changes of the lumbar spine (Tr. 18), and found that she did not meet Listing 1.04 for the following reasons:

> The limitations of the claimant do not satisfy the terms of listing 1.04 (Disorders of the spine). The claimant is not so functionally limited and the evidence does not support the medical findings required by listing 1.04 such as a condition that results in compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication established by findings on appropriate medically acceptable imaging and manifested by chronic pain and weakness, with accompanying ineffective ambulation. The record reflects that the claimant was able to effectively ambulate, specifically, multiple records reveal that she had normal gait and was ambulating without the need for assistive devices. (3F/4-6 and 6F/3).

(Tr. 21.)

Ms. Kimball contends that ALJ erred in her findings regarding this listing because her analysis focused on the ability to ambulate, and did not specifically discuss the cervical MRI findings, the diagnosis of a herniated nucleus pulposus entrapping the C7 nerve, or Ms. Kimball's complaints regarding the numbing and pain in her right arm. (ECF Doc. 14, p. 14-15.)

As with all substantial evidence evaluations, "the ALJ's decision and analysis should be read as a whole" in evaluating whether substantial evidence supports a Listings determination. *See Anderson v. Saul*, No. 6:18-CV-93-JMH, 2019 WL 4740231, *6 (E.D. Ky. Sept. 26, 2019) (citing *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012); *Athey v. Comm's of Soc. Sec.*, No. 13-cv-12529, 2014 WL 4537317, *3-4 (E.D. Mich. Sept. 11, 2014)). Here, the decision clearly reflects that the ALJ considered the relevant objective findings, subjective

complaints, and treatments regarding Ms. Kimball's cervical spine impairment.  (Tr. 22-23.)
Moreover, the evidence of record does not demonstrate that Ms. Kimball suffered "motor loss
(atrophy with associated muscle weakness or muscle weakness)" or "limitation of motion of the
spine" as a result of her impairment, as required by the Listing.  20 C.F.R. Pt. 404, Subpt. P,
App'x 1, Listing § 1.04(A).  Instead, the record contains physical exam findings of normal gait,
full range of motion, and full/normal strength in both upper and lower extremities, as observed in
the ALJ's decision.  (Tr. 22-23, 25, 417, 422-23, 428, 387, 322.)  The record also reflects that
Ms. Kimball's neurologist opined that her "hand symptoms I believe are early carpal tunnel
symptoms," unrelated to her spinal condition, a finding also noted by the ALJ.  (Tr.  22-23, 323.)

The record accordingly reflects that the ALJ's finding that Ms. Kimball did not meet
Listing 1.04 was supported by substantial evidence.  Moreover, given the clear lack of evidence
of record to support even a possible finding that Ms. Kimball meets Listing 1.04(A), any error in
failing to discuss the cervical impairment and related findings in the Listings analysis was clearly
harmless.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When
'remand would be an idle and useless formality,' courts are not required to 'convert judicial
review of agency action into a ping-pong game.'") (quoting *NLRB v. Wyman–Gordon Co.*, 394
U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)).

**2.      Whether ALJ Failed to Properly Account for Cervical Impairment in RFC**

Ms. Kimball also asserts that the ALJ's RFC limitation to "frequent handling, fingering
and feeling with the right upper extremity" is not supported by substantial evidence, arguing that
the record supported no more than occasional use of her right upper extremity for handling,
fingering, and feeling.  (ECF Doc. 14, p. 15.)  She bases this assertion on testimony that she had
numbness in her right hand (Tr. 60-61), medical treatment records showing she told her doctors

that she had been dropping things with her right hand (Tr. 321), a positive Spurling's sign on the right (Tr. 417), and an MRI documenting defects in her cervical spine (Tr. 312). (*Id.*)  The Commissioner argues in response that the RFC limitations chosen by the ALJ were supported by substantial evidence, and points out specifically that there is no medical opinion evidence in the record that would support a reduction to occasional use of the right hand, and that the majority of Ms. Kimball's physical examination findings were normal or benign.  (ECF Doc. 16, pp. 19-20.)

As discussed above, the ALJ provided a detailed and accurate discussion of the medical evidence relating to Ms. Kimball's cervical impairment.  (Tr. 22-23.)  She also identified evidence that she found inconsistent with the reported level of limitation, including self-reported activities of daily living like "completing personal care tasks, some cooking, cleaning, driving, and caring for her minor children on a daily basis."  (Tr. 25.)  Ultimately, the ALJ concluded that the record did not fully corroborate Ms. Kimball's allegations regarding the severity of her symptoms, explaining:

> although the claimant's imaging studies showed evidence of a disc herniation at C6-C7, causing strength reduction on the right wrist with flexion and arm extension at one appointment. The claimant's later record supported she was noted to have had normal strength in all upper and lower extremities and normal range of motion on exam.  Additionally, the claimant has no additional treatment reflected by the record after August 2018 and when questioned about this at the hearing, she reported she takes medications and just deals with the pain.  Nothing reflects further participation in more intensive services, such as inpatient treatment or emergency services.

(*Id.* (internal citations omitted).)

A review of the ALJ's decision and the record as a whole reflects that substantial evidence supported the ALJ's finding that Ms. Kimball's cervical impairment would limit her to no more than frequent handling, fingering, or feeling with the right upper extremity.  Thus, even if Ms. Kimball could argue that substantial evidence (or a preponderance) supports a limitation to no more than occasional handling, fingering, or feeling with the right arm – something that is

not at all clear based on the present record – it is well established that the decision in this case cannot be overturned because "substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003).

      **3.**      **Whether ALJ Erred in Assessing Ms. Kimball's Credibility**

      Ms. Kimball next asserts that the ALJ erred in failing to appropriately assess the credibility of Ms. Kimball's testimony regarding her cervical / right hand impairment and disabling pain in accordance with the Regulations.  (ECF Doc. 14, pp. 16-17.)

      "[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, *2 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

      SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  2017 WL 5180304, *2.  The revised regulations clarify "that

32

subjective symptom evaluation is not an examination of an individual's character." *Id*. Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered. 2017 WL 5180304, *8 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness.") (citing 2017 WL 5180304, * 11) *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law utilizing the old terminology. *See, e.g., Alexander*, 2021 WL 4459700, *14, n. 11; *Young-Roach v. Soc. Sec. Adm.*, No. 1:20-cv-1853, 2021 WL 4553128, *10 (N.D. Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at *5. These cases remain relevant because SSR 16-3p did not change the "two-step process" that an ALJ utilizes "when assessing the limiting effects of an individual's symptoms." *Martin v. Kijakzi*, 2021 WL 4066985, *5 (E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, 2021 WL 4145626, *5 (W.D. Mich. Sept. 13, 2021) (explaining that SSR 16-3p did not change "[t]he longstanding two-part analysis for evaluating symptoms.") (internal citations omitted). Thus, to the extent the term "credibility" is used herein, it refers to the standard of review in governing caselaw, with the understanding that the current standard is more accurately described as one of "consistency."

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's

symptoms.  SSR 16-3p, 2017 WL 5180304, * 3-4; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 2017 WL 5180304, at * 3, 5-8; *Rogers,* 486 F.3d at 247.

Here, the first step was met when the ALJ determined that Ms. Kimball's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 22.) As to the second step, however, the ALJ found "the record does not fully corroborate the claimant's allegations of physical health symptom severity," noting the conservative nature of the treatment she received for her spinal impairments, her largely normal physical examination findings, and her failure to seek additional treatment after August 2018, reporting that instead "she takes medication and just deals with the pain" without "further participation in more intensive services, such as inpatient treatment or emergency services."  (Tr. 25.)  Ms. Kimball argues that the ALJ failed "to properly consider [her] disabling pain," (ECF Doc. 14, p. 17), but the ALJ explicitly held that the "level of conservative, outpatient treatment" reflected in the record "is generally not consistent with the severity of symptoms the claimant has alleged for this period" (Tr. 25).  Indeed, Ms. Kimball herself testified that her back impairment was not disabling, and she was able to manage the work of caring for two young children at home alone during the workday, although she explained that the children generally play with toys inside, and she leaves "any type of, like, physical-ness" with the kids to her husband.  (Tr. 65.)  Based on this review of the record as a whole, it is clear that the ALJ was supported by substantial evidence when she found that Ms. Kimball's allegations regarding the severity of her symptoms were not wholly consistent with evidence of record.

For all of the reasons discussed above, the record necessitates a finding that substantial evidence supported the ALJ's various findings regarding Ms. Kimball's spine impairments, including her findings that Ms. Kimball did not meet Listing 1.04, did not require an RFC limiting her to occasional use of her right upper extremity, and did not allege symptoms that were wholly consistent with the remaining evidence of record. Accordingly, the undersigned finds that Ms. Kimball's second assignment of error is without merit.

**D.      Third Assignment of Error: VE Arguments**

In her final assignment of error, Ms. Kimball asserts that the ALJ erred in two ways in her consideration of the VE testimony. First, she alleges the ALJ erred in relying on VE testimony because the hypothetical in question did not require additional breaks or off-task time and did not limit Ms. Kimball to occasional use of her right upper extremity. (ECF Doc. 14, p. 19.) Second, she alleges that the ALJ failed to resolve conflicts between the VE testimony and the DOT as required by HALLEX I-2-6-74 and Social Security Ruling 00-4p. (*Id.* pp. 18-19.)

**1.      Whether VE Hypothetical Accurately Portrayed Impairments**

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Parks v. Social Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011); *see also Smith v. Halter,* 307 F.3d 377, 378 (6th Cir. 2001).  "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible."  *Parks*, 413 F. App'x at 865 (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Here, as discussed at length above, the record reflects that the ALJ's decision not to include additional breaks, off-task time, or upper extremity limitations in the RFC was appropriately explained in the decision and supported by substantial evidence.  With respect to the new argument that the ALJ must find that Ms. Kimball has to "stop performing [her] work" for fifteen to thirty seconds every five minutes, in light of the RFC limitation requiring that she be permitted to "move her head" for fifteen to thirty seconds every five minutes (EFC Doc. 14 p. 19 (citing Tr. 21, 44)), it is clear from a review of the testimony that the VE found the relevant jobs could be performed with the RFC as described in the ALJ decision (Tr. 44-46).

Because the hypothetical matched an RFC that was supported by substantial evidence, the ALJ properly relied on the VE's response regarding that hypothetical in her decision.  *See Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004); *Carver v. Saul*, No. 3:20-CV-00051, 2020 WL 8458801, at *18 (N.D. Ohio Oct. 5, 2020) ("Because the ALJ did not err in making her determination of [the] RFC, she properly relied on the VE's response to the[] hypothetical based on that RFC."), *report and recommendation adopted sub nom. Carver v. Comm'r of Soc. Sec.*, No. 3:20 CV 51, 2021 WL 164219 (N.D. Ohio Jan. 19, 2021).

### 2.    Whether ALJ Resolved Conflicts Between VE Testimony and DOT

Ms. Kimball next asserts that the ALJ erred by failing to comply with Social Security Ruling ("SSR") 00-4p and the guidelines of the Hearings, Appeals and Litigation Law Manual ("HALLEX").  (ECF Doc. 14, p. 20.)

Social Security Rulings "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the Social Security Administration and "are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1) (2004). "Although a Social Security Ruling does not have the force of law, it is binding within the Social

Security Administration as a statement of policy and interpretation that the S.S.A. has adopted. Courts generally accord SSRs deference unless plainly erroneous or inconsistent with the regulations." *McGeever v. Comm'r of Soc. Sec.*, No. 1:18CV0477, 2019 WL 1428208, at *10 (N.D. Ohio Mar. 29, 2019) (citing 20 C.F.R. § 402.35(b)(1); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 550 (6th Cir. 2004)). HALLEX is an internal procedural guide for the Commissioner that is not binding on reviewing courts. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008).

> SSR 00-4p provides:
>
> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.
>
> *Pol'y Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000)

HALLEX I-2-6-74 E similarly provides that an "ALJ must inquire on the record whether there are any conflicts between the occupational evidence the VE provided and information contained in the Dictionary of Occupational Titles" and "must explain in the decision how he or she resolved any identified conflict." HALLEX I-2-6-74 (S.S.A.), 1993 WL 751902.

In this case, a supplemental hearing was held to address an apparent conflict between the testimony of the vocational expert at the first hearing and the DOT. (*See* Tr. 15, 36-47, 306-07.) Ms. Kimball's counsel requested the hearing because the ALJ asked a hypothetical limiting the

individual to no more than occasional overhead reaching, and the first VE testified that the hypothetical person could perform past work which the DOT specified as requiring frequent reaching. (Tr. 306.) Ms. Kimball argues that even the supplemental testimony at the second hearing was insufficient to comply with the regulatory requirements because the ALJ "failed to ask [the VE] whether his testimony conflicted with the DOT" and "there was no testimony regarding the conflict between the job requirements of frequent reaching and the inclusion in the hypothetical question that the person was limited to no more than occasional overhead reaching." (ECF Doc. 14 pp. 20-21.)

As to Ms. Kimball's first point, the record clearly reflects that the ALJ asked if the VE's testimony was consistent with the DOT, noting that "the DOT calls for frequent reaching and you found occasional overhead reaching is not precluded." (Tr. 41.) The first requirement is met. As to Ms. Kimball's second point, the record reflects that the VE responded first by stating: "I would note that the Dictionary of Occupational Titles does not address the ability for overhead reaching." (*Id.*) The ALJ inquired why a limitation to occasional overhead reaching would not preclude jobs requiring frequent reaching, and the VE responded: "Well, when we're talking about reaching, we're talking about reaching in all other directions, not overhead. These occupations do not require overhead reaching." (*Id.*) This inquiry and response is sufficient to comply with the requirement under SSR 00-4p that the ALJ "elicit a reasonable explanation for the conflict" before relying on VE testimony. *See Lawrence v. Comm'r of Soc. Sec. Admin.*, No. 1:16-CV-885, 2016 WL 7229370, at *10 (N.D. Ohio Dec. 14, 2016) (finding no error where ALJ noted inconsistency between VE testimony and DOT and elicited reasonable explanation for conflict before relying on testimony under SSR 00-4p).

For all of the reasons stated above, the undersigned finds that Ms. Kimball's third assignment of error is without merit.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


December 13, 2021

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).